D-Day landings, which remained the largest amphibious assault in the history of warfare. It truly was one of the most consequential military campaigns in human history, and eleven months later, the war in Europe was won. So on this 80th anniversary, I just wanted to commemorate the heroism and the valor of those who landed on the beaches and who scaled the cliffs and who began liberating Europe that historic day. So I think the entire world then and now really owes an unpayable debt to the greatest generation. And with that, we'll call today's one and only case 23-50869 State of Texas v. the U.S. Department of Homeland Security. Solicitor General Nielsen, whenever you're ready. Thank you. May it please the Court, Aaron Nielsen on behalf of Texas. A lot has happened since Texas noticed this appeal, but the motion panel's analysis with respect to Texas' right to injunctive relief was correct six months ago, and it's correct today. Chief Judge Moses found that defendants engage in, quote, culpable and duplicitous conduct by lawlessly destroying Texas' property. Specifically, she found that even when there is no emergency, they destroy Texas' fence not to enforce immigration law, but rather to enable illegal border crossings. The government, the defendants, can't show that that was wrong, let alone clear error. They also have never disputed that this is black and white trespass under Texas law. Chief Judge Moses also found that the equities overwhelmingly favor Texas. Not only is destroying someone else's property inequitable per se, but destroying this property enables drug smuggling, weapon smuggling, and human trafficking. Importantly, she also found that Texas' fence direct people away from dangerous river crossings and that the defendants' argument, which she called cynical, is endangering people's lives. The only thing that she didn't do was she said that Texas isn't entitled to injunctive relief because of her understanding of Section 702. She read Section 702 to contain an implicit carve-out for state law claims. As the motions panel explained, that's not what 702 says, and no circuit agrees with defendants on that point. Really, that ought to be the end of this appeal. Because the defendants have no great answer for Chief Judge Moses' factual findings or the motion panel's interpretation of 702, they've attempted to muddy the water, most notably about events that happened in January and Eagle Pass. They now concede that those events are irrelevant to this appeal. In January, the Supreme Court did not know, one, whether the federal government still had access to the border, and two, whether Texas was honoring the injunctions requirement to allow emergency medical assistance. The record on remand, again, shows that both of those things are in Texas' favor. The United States does have access to the border, and Texas will allow, if there is necessary, you can cut Texas' property for emergency medical relief. General, so my question with respect to the supplemental fact findings, I mean, a lot of the supplemental fact findings are with respect to the Shelby Park operation, I guess. And, you know, of course, the original appeal isn't about Shelby Park, per se, or whether immigrants are being apprehended there. The original appeal is about access to whether Border Patrol has access to the international boundary, both from the land side and the river side. So I guess my question is, as a factual matter, given the supplemental findings, does the Border Patrol have access to the river road within Shelby Park and the golf course part of Shelby Park? How do you interpret the fact findings there? Because the reason I ask, because I want to be very transparent, is if they don't have access to that, then I'm a little bit concerned that the original injunction that we entered and that was in vacated, that, you know, I'm not asking this well. Suppose this. Suppose we were to reinstate the original injunction. Would we have to modify it to account for what has happened in Shelby Park with respect to access to the road? That was a very poorly drafted question, but you have to answer it anyway. No, it was a fine question. Thank you. The answer is they have access to the road up to the park. There's a gate to the park. Okay. If they claim that they have access under federal law, they have some authority to come into the park, they can sue for that. They have not. We are not questioning nothing in our lawsuit. Again, we're plaintiffs here. It's about whether they can access our park. Right. It's about whether they can cut our fence. Okay. They claim that they have access to the park. They can sue to get access to the park. Now, to be fair, to be sure, we give them access. If there's an emergency, the record here is that they can enter the park. They also have access to the park. What do they have to do to enter the park, I guess is what I'm asking. So I would point the court. This is ‑‑ I'm looking at ROA 2620. If BP were there to respond to an emergency situation, I would immediately call the battle desk, let them know, and then send up a spot report so they can ‑‑ that way my people in the leadership knows knowing, and then we would let them through the gate. So they would come to the gate, they would say there's an emergency, and then they could enter. That's, I don't think, disputed by them. Again, I don't think that's relevant to the injunction that we seek, which is just don't cut our fence. If they think they have a right to the park, they can get to the park. Also, of course, the boat ramp is in the park, and it's undisputed that since January 12th at noon, they can enter to go to the boat ramp, so they are in the park. To answer your Honor's question, I don't think you would have to modify the injunction at all, because we're only talking about the fence, not about the gate to the park. Okay. Thank you. I would also like to make one point about what happened back in January, which I think is particularly troubling, and that is the statements that the United States made, they did not tell the full story. And the one that jumps out to me, that I find most troubling about it, was their declarant in the Supreme Court, who purported to have personal knowledge, was in Detroit. He was not there at any point during this entire proceeding. Now, to be sure, they have arguments about that, but the idea that you would submit a declaration that doesn't contain that information, now, that goes to the veracity. Now, you can agree or disagree, whatever, but that's the least relevant information that I would expect a declaration filed by the United States would contain at least that information. Three additional points, if I may. I think it's important, if this Court goes back and looks at anything in the record, to look at the video of September 20th. That was the video that was particularly important to Chief Judge Moses. I would urge the Court to look at it. I would also urge the Court to look at ROA 269 through 270. That is what's happening, the conduct leading up to the TRO. What often happens in litigation, especially litigation that's gone on for a while, is there's a little bit of a drift over time, and we start talking about different ideas and different scenarios. Go back and look at the actual facts on the ground when Chief Judge Moses held her hearings and made her factual findings. I think that it's pretty clear why she uses words like disingenuous and cynical and culpable and duplicitous in her orders, which are strong words from a federal judge. I would go back and look at that, and I think the Court would see why she used that particular language. I would also like to talk a little bit about intergovernmental immunity. The way that the United States has litigated this case is not as a preemption case. In fact, in the district court, they were asked, are you relying on Arizona? And they said, no, no, no. Again, paraphrasing here, no, no, no. This isn't an Arizona case. This is an intergovernmental immunity case. Well, that matters because the Supreme Court unanimously in United States v. Washington set out a two-part test for intergovernmental immunity. One is, are you discriminating against the United States? Nobody suggests that we're discriminating against the United States. The other is, are you regulating the United States? But you can go back time immemorial, property rights, that's not regulatory. In other words, if it were, every rancher who has a fence that says don't destroy my fence is somehow regulating the United States. Is it the state's position that the use of preexisting common law cannot, categorically, cannot be used to regulate the federal government for purposes of intergovernmental immunity? I don't know if all of common law. Respectfully, I'm thinking that one. I've not thought about that all the way. I certainly know that property rights, the proprietary interest, that's always been distinguished from the sovereign interest. So the cases they point to are, you know, like Johnson, you can't put a license requirement on the United States. That's obviously regulatory. But the idea that merely enforcing property rights is regulatory. Let me ask you it this way. Let's say a different border state, in the name of vindicating their property rights, let's say a different border state also puts up C-wire, not for the purpose of deterring illegal border crossings, but instead to prevent border patrol from apprehending immigrants at the border. They do it in the name of property rights. Would that be regulating or interfering with the federal government's border policy? I don't think so, Your Honor. But then we can have a more interesting conversation about 1357A3, which is the exception to the warrant requirement that allows the United States to access property within 25 miles of the border. So if I understand Your Honor's hypothetical, in that situation you would have a state who's deliberately trying to stop them from being able to enter the property. They have a right to access to the property. We've never disputed that. But, again, I'd point the court to read the language of 1357A3. What do they have? They have a right to access the property, which here they already have because they have both sides of the river. But further, again, I'm reading the language of the statute, they can do so for the purpose of patrolling the border to prevent the illegal entry of aliens. So here we have a finding that they're not doing that. So in Your Honor's hypothetical, as I imagine, a state is they're trying to do what 1357A3 says that they can do, and you're not allowing them to do that. That is not this case because we have a finding, a fact, that that's not what they're doing. And even if they were doing that, they have access already, which is all the statute requires. And, again, also I think it's important. We think we prevail for all the reasons that the motions panel recognized, and follow the motions panel's analysis. We think that's spot on and correct. But we also think that there is merit to our APA and our ultra vires arguments, and we don't think respectfully that Chief Judge Moses' reasons on those are that persuasive. I would like to talk about the APA one first. She says that we can't show that there was a policy, we didn't conclusively show that there was a policy. Well, that can't possibly be correct in a preliminary injunction posture. We don't have to conclusively show anything. We have to show a likelihood of success on the merits. That's not the correct legal standard. So even if, putting aside our trespass theory, we would prevail, at least this Court would have to vacate her opinion for further analysis of the correct legal standard. She didn't apply the correct legal standard. And the idea that there isn't a policy here, I think it's hard to take seriously. I would urge the Court to look at our complaint and our preliminary injunction papers. There's public statements from them. They do the same thing day after day after day after day in the same way, and then suddenly it all stops. It's hard to believe that that's individual officers making on-the-spot discretion if everyone does it the same way, different people, and then it suddenly stops all at once. So, again, we would urge the Court onto that. And as for ultraviolet analysis, I don't see any analysis in Chief Judge Moses' opinion of Your Honor's decision and after the Department of Homeland Security, or DHS rather, that I think would be important for her to do. So assuming that we don't prevail on the trespass theory, which we do think we should, at a minimum the Court needs to vacate her decision and have her apply the correct legal standard. What is your best case or statutory authority for the proposition that Border Patrol has the discretion to turn away those attempting to enter illegally, to simply turn them away at the border as opposed to apprehending them? I guess I don't want to be too glib and say the President's proclamation from two days ago, but I would point the Court to the Supreme Court's decision in DHS v. Thurigossium. I'm sure I'm mispronouncing it. That's the question about whether the rights kick in as soon as you get a toehold in the United States, and the Supreme Court says no. Now, to be sure, that is about due process rights, but the analysis we think holds and we think that has to be the theory undergirding the President's proclamation from two days ago, which, again, I think is flatly contrary to the position that they've taken in this Court, in the Fifth Circuit, in the District Court, and in the Supreme Court. And we also think, you know, I would— Contradictory how? Well, contradictory in that they've told the District Court and this Court and the Supreme Court essentially the toehold theory. If you get one toe into the United States, you are entitled to the asylum process. That is not consistent with what the President said two days ago, that if you get—that they can turn off the asylum process if too many people are trying to come in to the country. I don't see how you square those two theories. The way that they did so yesterday in their response to our 28J was to say, no, no, you can apply, you're just not going to get it. Well, if you are categorically ineligible to receive something, I don't think it makes much sense to say that that's actually an application. And I still don't understand how they square that with the statute. We think the argument is until you actually have a significant presence in the United States, the statutory—just as the due process doesn't kick in, neither does the statutory rights. I see that my time has expired. Thank you, Your Honor. Thank you very much. We'll now hear from Ms. Patterson, representing the Department of Homeland Security. Welcome. Thank you, Your Honor. Melissa Patterson for the federal defendants. Texas is here seeking an injunction to force federal officials implementing immigration law at an international border to conform to state tort law. There are multiple independent legal barriers to this novel theory, whether you locate it in sovereign immunity, as the district court did, either because of the second sentence or the final sentence of Section 702, whether it's because Texas can't satisfy the separate inquiry once you get past sovereign immunity as to whether or not Congress has subjected the federal government to the underlying law they want to assert against us. Here, trespass to chattel and state conversion causes of action. And finally, as an independent barrier, there's 8 U.S.C. 1252-F1, which bars the type of restraint on the operations that, in the government's view, are necessary to carry out their statutory authorities in Sections 1225 and 1226. I think that the myriad legal problems that exist to this type of novel theory are reflected by that. As far as the government is aware, no court has ever issued an injunction requiring federal officials to conform their activities going forward to state tort law until the motions panel in this case issued one, which, of course, the Supreme Court then vacated. So let me just see if I understand the federal government's position. Your position, as I understand it, is the motions panel and this panel cannot rely on any facts that occurred after the time of the original district court's decision denying a preliminary injunction. We can't do that. But you can go to the Supreme Court and bring up events, make representations about events that happened after that, take over Shelby Park, drownings of migrants, in order to vacate our temporary injunction. Is that right? That's right. But if this court were again considering an exercise of its 1651 authority, if it were again considering interim relief while— Well, we're up here on whether to—we're up here on the denial of a preliminary injunction now. Correct. And the jurisdiction this court is currently exercising at this stage in its proceedings is under 28 U.S.C. 1292. It's an interlocutory appeal. The usual rule is that the record is closed to us out there. Now, I want to make clear, we're happy for this court to look at the remand findings because we think they strongly undercut the arguments. That's not what you say in your briefing. Let's say we were, just hypothetically, were to reinstate something like the injunction that we issued as a temporary injunction. Maybe we modified a little bit. Who knows? If you then went to the Supreme Court and asked for emergency relief again, would you be able to rely on facts that happened after today or the supplemental facts that the district court found in order to do that? We would again be invoking 28 U.S.C. 1651. So you could rely on it, but you're saying we can't rely on those facts in order to assess whether there should be preliminary injunctive relief. If this court were going to issue an interim relief, not a reversal of the— We're not on interim relief right now. We're reviewing the denial of a preliminary injunction. I agree. And the usual rule is that, as the district court said, how can I have abused my discretion on November 29th based on facts that happened afterwards? And that is, I think, the narrow question over which this court has jurisdiction. I'm just trying to understand whether you're going to do the same thing again, no matter what we do here. I mean, consider our position. We issued a temporary injunction pending appeal. It was based on the facts in the record. And you went to the—and we even granted expedited appellate review. And yet you went to the Supreme Court and brought up new fact findings in order to vacate our temporary relief. How are we supposed to even react to that? Your Honor, the reason we brought up new facts was because of Texas's unprecedented and unannounced takeover of a stretch of the border, which this—armed with this court's injunction. We didn't first make a filing in this court, which is the court that had issued the temporary injunctive relief, saying there's new facts on the ground. Because we already had a fully briefed application pending before the Supreme Court. Texas waited until hours after we had filed our reply in the Supreme Court. So the Supreme Court was seized of that matter. I do want to note that in order for us to have secured vacater from the Supreme Court, we had to make a fair—a showing that we had a fair prospect of succeeding on the merits. And here, in these—the brief supplemental briefs here, Texas suggests that this court should only look at the facts. So do you think what the Supreme Court did should bear on our consideration of whether preliminary injunctive relief was appropriate or not? Yes, I think that— So the Supreme Court that considered facts that you brought up after we entered temporary relief, you think that what the Supreme Court did then should bear on what we're deciding now. Is that right? Yes, Your Honor, and in part because the Supreme Court— I think the fair inference from the vacater, given that in order to get that vacater, we had to show that we had a fair prospect of success on the merits. So the drownings, for example, the representations you made with respect to drownings in the Supreme Court, now we have fact findings from the district court with respect to that issue. So should we or should we not consider that issue with respect to— with respect to whether preliminary injunctive relief was appropriate? I think this court should look at the record as it exists— No, the drownings. Should we consider the fact findings on the drownings as to whether preliminary injunctive relief was appropriate? As a technical matter, no. Now, again, we have— As a technical matter, no, but the Supreme Court vacated our temporary relief based presumably in part on representations about the drownings, but we can't consider that now? Your Honor, I think that is the natural result of the different jurisdiction the court is exercising when it reviews an interlocutory appeal. The order giving this court jurisdiction under 1292 is the one entered in November. If this court again, if Texas had come back to this court after the filings, after the hotly disputed filings regarding the drownings, which of course the Supreme Court was well aware they were disputed when it vacated, if they came back to this court and said, we think you should again issue interim relief under 1651, then you could look at all the facts. I think it's telling that Texas did not, has never suggested, that this court should entertain a new motion for an injunction pending appeal or put some interim relief while this court remands for consideration of a new PI motion. That's not what Texas has asked for. That's not what this court has done. But I want to return to the more fundamental point that even apart from the facts, I think the Supreme Court's reversal, the vacater of this court's injunction, should give this court a real reason to take a fresh look at the merits here. We sent it back for supplemental fact findings. We held the case in abeyance and sent it back for additional fact findings. Now you're telling me I can't rely on them. It was a little perplexing, Your Honor. Not perplexing to me. Well, the district court and the parties, I think, indicated their confusion about what role the fact findings would play. But of course we all complied with the court's order and engaged in those fact findings. Now again, apart from what we think are the jurisdictional limits here, we don't actually have a reason to not want the court to look at those findings. What Texas is saying in its supplemental brief is it tried to get the district court to make the findings. It's asking this court to do so, and it failed. The district court found that we are barred from Shelby Park, that they did block us from using the boat ramp until we filed our first supplemental. Are you blocked from using the boat ramp now? We are not because Texas restored access. So you are not blocked from using the boat ramp right now? That is correct. We are blocked from patrolling the land. This goes to one of the questions you asked earlier, Judge Duncan, along the border. This is a district court finding at 2329. We may not enter to walk along the border. A district court finding at 2317 that we remain partially blinded. Texas' forcing out from the area of our scope trucks meant that we no longer have cameras. We don't have eyes on these stretches of the border. The district court found that because they had not warned us, we were blinded. The district court said, and we agree, we've regained some camera vision along here, but it is not perfect, and the district court could not conclude how blinded we remain. I do want to talk about the merits because I think that the Supreme Court's vacater should give the panel a real reason to take another look at those merits. I'd like to start with the sovereign immunity issue because all of the cases that this panel cited in the I'm sorry, not this panel, the motions panel cited in its temporary order were cases where the waiver of sovereign immunity in 702 was extended to federal causes of action. Every single one of the cited cases. It is a distinct question whether or not 702, without saying a word about state law, was intended to waive sovereign immunity to state law claims. There is no court that has actually issued an injunction on the basis of that reading of the sovereign immunity waiver. Separate from that, there is the final sentence in 702 that says, when there is a statute that consents to suit another waiver of sovereign immunity, but it impliedly precludes the relief sought, that 702's more general waiver doesn't apply. And the Supreme Court, in the Maciej Minaszewicz decision, explained that you can't use the general 702 waiver of sovereign immunity as an end run around Congress's more specific choices when they've already addressed a, quote, type of grievance. Congress has addressed the instances in which state officials can be sued for failing to comply with duties under state tort law. They did so in the Federal Tort Claims Act. And it comes with a lot of limitations. There's the discretionary function exception. If we're exercising a decision that's rooted in social, economic, political policy, you don't get to sue us in tort over that. And the Supreme Court in Varick Airlines explained that's really important because when Congress was crafting the FTCA, it was trying to make sure you weren't having judicial second guessing of those types of decisions. On Texas's theory, none of those limitations apply. The limitation to money damages doesn't apply. The discretionary function doesn't apply. So you could get a much more intrusive order against the United States under state tort law, on their theory, than the Supreme Court has already made clear you can't get under the FTCA. That would be a wild expansion of the waiver of sovereign immunity and destructive of Congress's very careful choices in the FTCA about state tort law. And I think Texas's only response to this is, well, you know, there's a different type of relief. There's only money damages under the FTCA. And that analysis is specifically what the Supreme Court rejected at footnote three of the Matchie B. Nash-Lewis decision. It said we don't look to the quote type of relief. We look to the type of grievance. I believe they're drawing that from a letter from then Attorney General Scalia, explaining that where Congress has already thought about, hey, how do we want to subject the United States to a type of grievance and issued a limited waiver, you abide by that limited specific waiver and not 702's more general one. So I don't think this court actually needs to decide the sort of top line question about whether or not 702 could ever waive sovereign immunity to any state law claim. All it needs to decide, and I think all the district court here decided, was that with regard to state tort claims, 702 does not provide a waiver of sovereign immunity. Now, even if it did, there is a separate inquiry as to whether  you don't get to conflate the existence of the waiver of sovereign immunity with the applicability of the underlying law. That's what this court on Bonk said in the Supreme Beef decision. That's what the Supreme Court made clear in the Flamingo Industries decision, where there were waivers of sovereign immunity to bring claims against the United States. In Supreme Beef, people tried to bring state law claims against the United States. And this court said, well, no. Just because you have a waiver of sovereign immunity, there was a bankruptcy-related one, that doesn't mean you can apply state law to the United States, which is what Texas is trying to do here. They say this isn't a direct regulation because this is sort of a general tort law. The Supreme Court has specifically explained that the Supremacy Clause does not care whether this is, as the court in Johnson said, the most universally applicable of state norms, like murder. It does not matter if it's a very general tax law that the state is welcome to apply to anybody else. It cannot directly apply a tax law to the United States in Texas. And it cannot directly apply its tort law to federal officials carrying out federal responsibilities at the border. And this is, let's make no mistake, a very direct regulation. They want a court order requiring federal officials carrying out federal statutory duties to conform to state law. It's hard to imagine a more direct application of state law than that. And I want to note, if Texas can do this, so can every other state. I think you had a hypothetical? And the federal duties that were being carried out were 8 U.S.C. 1357? Is that what you're? That's one of them. 1225 and 1226 are also very much at play. What about the argument that intergovernmental immunity wouldn't apply here because these federal agents were not validly acting pursuant to federal law per the district court's findings? The district court found that the agents were, quote, cutting multiple holes in the Constantino wire for no apparent purpose other than to allow migrants easier entrance further inland, unquote. And therefore they weren't acting pursuant to 8 U.S.C. 1357 because that statute permits federal agents, quote, to have access to private lands for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States. And the district court found that Border Patrol wasn't cutting the fence to apprehend immigrants or to prevent illegal entry. It was quite the opposite, actually. Your Honor, I think all of those descriptions from the district court were based on a fundamental misunderstanding about the legal authority that Border Patrol agents have. The district court clearly thought, said repeatedly in the course of deciding that we were being derelict and not carrying out our responsibilities, that we had statutory authority. We simply lack. There is no turn-back authority. Once someone is within the United States, once they have entered and are present in the United States, regardless of whether they have entered unlawfully or whether they've entered lawfully at a port of entry, 8 U.S.C. 1158 gives folks a right to apply for asylum. Nothing about the proclamation and the rule that accompanied it changed that. It imposed a limitation on eligibility. It's going to be harder to get it, to get asylum for a lot of folks, but you still get to apply. You still get to be processed. When Border Patrol agents... You can apply, but as the Solicitor General noted, there's a hard categorical cutoff at a certain point. You can apply all you want, but no relief will be coming your way. Your Honor, you can still try to make a case that you fall within, that you still meet the eligibility for asylum. There are new limitations on that eligibility, but there's still a process in what the district court said. And notably, Texas did not attempt to defend this legal error until its filing yesterday. All of its citations when it said it has made this turn-back argument were to things it said in district court. I think it really led the district court into error on this point. Are based on the idea that individual Border Patrol agents, instead of bringing people into the system, inspecting them, processing, giving them an opportunity to apply to asylum, that none of those apply. And Border Patrol agents can simply force people back across the border who have already entered. I, too, would like the court to read the Thurassigiam, which I, too, have trouble saying, decision, because it is all about the statutory rights that the migrant there got, despite the fact that he had been apprehended 25 feet into the United States. That decision, and the Saleh, the Haitian decision, stand for the proposition that if you've made only this very minimal entry, you don't get extra constitutional due process rights. Whatever Congress has provided you satisfies due process. Congress has provided people who make entry into the United States with the right to apply to asylum, and nothing about that has changed. So the district court's characterization, and I do think it's worth looking through them, at Record on Appeal 948, 949, 950, 951, 952, that entire discussion at every single page, the court is referring to this turn-back authority. Why didn't you just tell them to go back to Mexico? That does not exist. And that, I think, really infected all of the district court's descriptions of Border Patrol agents. You know, it was a very recent decision. It was, I believe, the Alexander v. South Carolina decision that very recently came down from the Supreme Court. They talked about how when a legal error sort of taints and infects the lens that a court brings to making factual findings, that's not clear-air review. The court has to look at whether or not that sort of legal error tainted the description. So I think there's a second legal error here. It's not just the utter absence of turn-back authority. There's also the idea that the court thought that when we were having, when our Border Patrol agents were allowing people to come in further inland, I think you read that quote, that we were not trying to process them, that we were not trying to get their fingerprints and get them into the system. Part of the reason that it would be quite convenient for the federal defendants, if this court were to look at the limited remand filings, is that the testimony there makes clear that the inference that Texas asked the district court to make, which the district court didn't go quite all the way there, but it flagged the discrepancy in numbers between the something like 4,500 migrants counted on a certain day, I believe it was September 20th, and the 2,800-odd who were reflected in our statistics for those days. So I urge the court to look at Record on Appeal 2826-29, where it is explained that it takes some time to get people processed and logged into our systems. So the simple fact that you don't see every person on the day they entered reflected in those statistics doesn't mean they're not getting into the system. They just might be in the next day's statistics or the next day's. Quick follow-up on intergovernmental immunity. It seems like intergovernmental immunity presupposes a situation where a state is adversely affecting or adversely sort of interfering with federal operations. But if the district court's findings here show that the net effect of the CYR was actually helping Border Patrol, how would that finding affect your intergovernmental immunity analysis and how we would consider that? I don't think it would affect at all. I don't think there's some sort of, you know, can you directly regulate the federal government if it seems like it's going to help them? I don't think that's how the Supremacy Clause works. You know, there's the case about oleomargarine. I think it's Ohio v. Thomas, where the Supreme Court found that the state couldn't apply its laws against the use of oleomargarines to a federal soldier's home because it would interfere with the operation of that home. And I don't think the federal official's choice of breakfast spread was really something so key to the operation of the home that, you know, I'm sure the state thought it was doing a favor by making sure that you had real butter and not oleomargarine, but that was nonetheless a Supremacy Clause violation because you had a state trying to exert its laws to control the way the federal officials were carrying out their duties. And that's precisely what we have here. I see I'm out of time. If I may just make one point about the APA and access to the park. The district court, I'm a little perplexed by the suggestion that you would need to vacate a district court that did not find a final agency action given that the case is ongoing. If Texas wants to argue again that there is final agency action, the district court would have an opportunity to consider that. Of course, we think the district court was very correct in saying when you're looking at a broad statutory mandate like deter illegal entry, intercept unlawful migrants, and a sort of discretionary day-to-day management like how do we move obstacles to get to the border, that that's the sort of programmatic attack the Supreme Court has said and Southern Utah Wilderness and Lujan is not a final agency action. We think that was correct, and there's no reason to turn it off, to change that. And then finally, in terms of access to the park, I just want to note that the district court did specifically find that Border Patrol agents are not allowed by the Texas officials to access that stretch of the border except to use the boat ramp. We cannot walk along the wire and see if there's someone we think should be apprehended, see if there's somebody having a medical emergency. What's the record citation to support that statement you just made? I believe it is 2329, but let me check that. Sorry, Your Honor, I don't want to take the court's time. No, that's okay. I can always come back up if it's – oh, I'm sorry, it is. It's 2329, a district court finding that we cannot patrol the border in the park. We can only get in to access the boat ramp. Thank you, Your Honor. Thank you, Ms. Patterson. We ask the court to affirm the denial of preliminary injunctive relief. Thank you. Ms. Trice, if you would, just add a minute to the Solicitor General's time just to even things out. Okay, you're back for five minutes on rebuttal. So I'd like to make a number of points. One, about their heads-I-win-tails-you-lose theory, the idea that they can, one, tell the Supreme Court new things, but, two, this court has to take the Supreme Court's decision as somehow a reflection on the merits. Those two things can't both be true. The idea that they can say new things that happen afterwards but nonetheless still say you should read some inference into the court's decision to vacate, it's irreconcilable. That cannot possibly both be right. I'd also point the court to Povey Labrador, Justice Kavanaugh's statement, saying these decisions don't read into them in their merits, that they're not merits decisions. I'd also like to talk about the idea this is novel, what we're saying here. I put to page 25 of our brief, we have a number of examples of where states do impose state law on federal officers. The distinction, and I think it's a critical distinction, is one, intergovernmental immunity. There's also a whole body of cases where they're not supported by federal law at all. So I know that if you go back and look at the takings context, I'd point to the Supreme Court's decision in Nick. How did you historically litigate takings claims? You would bring a claim against a federal officer under state law, and then the federal officer would either have a federal defense or not. That's how historically this was done. So even putting aside the intergovernmental immunity cases, their theory just is not accurate. Again, Chief Justice Roberts' decision in Nick. I'd also say the argument rests on a misstatement of the facts. Chief Judge Moses found that they weren't acting, carrying out federal responsibilities. So you don't need to get into any of that because the premise of the argument simply is not true. I don't hear anything from the federal government, respectfully, that would undermine the analysis, very straightforward, in the motions panel's decision. Again, these are interesting sideshows, but the court could simply do what it did in the motions panel, but this time in a merits decision, and we end up in the right place. I'd also talk about a little bit of 1252. They talk about the bar on injunctive relief. The motions panel addressed that as well. I didn't hear anything from my friends on the other side that would undermine the motions panel's analysis of 1252. Also, there was a statement about whether or not there's visibility reduced. I think it's important to look at the map, the picture we show in our supplemental brief. There are two ports of entry right above the park. This isn't... When I first came to this case, I thought, oh, maybe this is, like, far off someplace, you're not actually by a lawful port of entry. There are two. You can look up and you can see them. And there's... This is on ROA 2866-267. You can just drop your chin down and look down and see this entire area. But say am I wrong about that? There's a point that I've not heard ever a satisfactory answer for from them about the breadth of their position, what's their limiting argument. So assume that a rancher... Remember, their argument would apply equally well to ranchers and families, not just to Texas, to everybody. Imagine that a rancher builds a barn on their property. There's a barn. And now they can't see through the barn, so they can't see the border. Is it their position that 1357A lets them tear down the barn? There's no statutory authority anywhere for that. The position is not backed... is not supported by statutory law. And, you know, it's... Talk about an elephant in a mouse hole, the idea that, you know, we mentioned in our briefing that there's 1,200 miles of border. 1357A-3 says 25 miles you have access. You know, I did some multiplication. That's 30,000 square miles. That's the size of South Carolina. Is it the position of the United States that they can preemptively tear down every fence and every barn in South Carolina? It's absurd. That can't possibly be correct. Do you agree that on the 702 waiver point, a sovereign immunity waiver, do you agree that there are no cases saying that that waiver does not apply to state law causes of action? No, Your Honor. I thought we cited some, but, you know, I made mistakes. Yes, Your Honor. Correct. The D.C. Circuit, the Third Circuit, and they have none on their side. I thought a Supreme Court case was... the other side cited to us a Supreme Court case whose name I can't... not Thurigassium, but a tribal name that settled that issue. Yes, Your Honor. That was a quiet title action, but yes. And that's the next point I was going to say. For me, there's a difference. As the motions panel explained, there's torts and there's torts. There's a tort that's a one-time, one-off thing for which you would seek relief would be damages. An ongoing tort and tort law has always been treated differently, and, you know, if it's helpful, remember, at common law, you couldn't have even brought these same claims in the same building. If you're seeking an injunction for an ongoing harm, that would be in a court of chancery. If you're seeking a harm for damages, that would be in a court of law. They can't possibly be the same claim. Is the idea that you would sue the federal government for damages every time they tore up the C wire? That seems to be their suggestion, that we would be in court every single day making the same argument. That is not how tort law works. That's not how the FDCA works. And finally, the last point, if I may, on turn-back. That's not irrelevant to our claim here at all. We're getting far afield. But if we're going to talk about that, I would urge, again, the Court to go back to September 20th, look at the video. There are people not on the U.S. side of the river. They are on the Mexican side of the river, and there's a boat looking out there, and there's not one word from the boat saying, turn around. So this isn't even people on U.S. soil, on Texas soil. There are people who are on the other side of the river, and there's no pushback whatsoever to say, don't come there. So the whole idea, it's a sideshow. But regardless, we also cite in our 28J, CFPB's own practice, where they do count the turn-backs. So the idea that there is no authority simply does not stand. We ask the Court to vacate the District Court's decision and order an injunction. Thank you, Your Honor. Thank you. The Court's grateful for the able advocacy of both sides, and the case is submitted. And that's the one and only case for today, so the Court will stand adjourned.